UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | NO.   3:24-cr-00216 |
| v. | ) | |
| | ) | |
| JEFFREY SCOTT WELLS | ) | JUDGE RICHARDSON |
| | ) | |
| | ) | |

## UNITED STATES' SENTENCING MEMORANDUM

The United States, by and through Assistant United States Attorney Taylor J. Phillips, hereby submits this Sentencing Memorandum. Sentencing is scheduled for Friday, July 18, 2025. Pending Defendant's Rule 32(i)(4) statement at sentencing, if any, the United States anticipates requesting that the Court sentence Defendant to ten months' imprisonment and the special conditions recommended in the Presentence Report (PSR). The United States further requests that the Court impose the mandatory $100 special assessment.

### I.   FACTUAL BACKGROUND

The offense to which Defendant pled guilty is quite simple: in early 2021, he lied under oath about whether he had discussed deposition testimony with Wesley Landers.

The *context* of that offense is considerably more complicated, however. In 2019, Wesley Landers was the Deputy Commissioner and Chief Financial Officer (CFO) for the Tennessee Department of Corrections (TDOC). (PSR, at ¶ 9.) As of that time, TDOC had contracted with Corizon to provide behavioral health services to TDOC inmates. (*Id.*, at 10.) The TDOC-Corizon contract was expiring, however, and the State of Tennessee issued a Request for Proposal (RFP) for a new behavioral health services contract. (*Id.*) Centurion, one of Corizon's competitors,

ultimately won that RFP and was awarded a contract worth approximately $120 million. (*Id.*, at ¶ 11.)

The RFP was not conducted on a level playing field, however. Behind the scenes of the RFP, Landers provided inside information to Defendant, one of Centurion's vice presidents. (*Id.*, at ¶ 12.) Over the course of more than a year, Landers used his Gmail account to repeatedly send pre-release drafts of the RFP to Defendant, some of which included confidential comments of Tennessee's counsel. (*Id.*, at ¶ 12(a), (b), (c), (d).) Landers also used WhatsApp to send Defendant other confidential information relating to the bidding process. (*Id.*, at ¶ 12.) These communications were inconsistent with the RFP process, during which the State's statements regarding the RFP should have been run through a single, different office in a manner transparent to all bidders. (*Id.*, at ¶ 33.) Moreover, according to Landers, there was "no question" the inside information helped Centurion. (*Id.*, at ¶ 38.) Corizon agreed. (*Id.*, at ¶ 36.)

Around the same time that Landers was providing confidential information to Wells, Centurion agreed to hire Landers as the vice president of its Georgia operations, reporting to Defendant. (*Id.*, at ¶ 13.) The position was specifically created for Landers, and it was not advertised to other candidates. (*Id.*) Neither Landers nor any other candidate was interviewed before Landers was hired. (*Id.*)

Landers knew that this arrangement did not look good. (*Id.*, at ¶ 39.) In fact, he knew it looked criminal: he sent a copy of the indictment in *United States v. McCabe*, 2:19-cr-00171 (E.D. Va. Oct. 24, 2019), to Defendant just days after it was filed and during the period when Landers was sending Defendant draft RFPs. (*Id.*, at ¶¶ 12(f), 42.) The *McCabe* indictment alleged, among other things, that the Sheriff of Norfolk "forwarded the Sheriff's Office's legal counsel's email that contained [a] draft RFP through two private email accounts and then to" an

officer of a company which contracted with the Sheriff's Office. (*Id.*, at ¶ 12.) According to Landers, he found the *McCabe* indictment while searching for "the worst thing that could happen to him." (*Id.,* at ¶ 42.)

As of 2020, this conduct had not yet been discovered. Unhappy with other aspects of the bidding process, however, Corizon sued Centurion and the State of Tennessee in October 2020. (*Id.*, at ¶ 14.) During the course of that litigation, Centurion terminated both Defendant and Landers. (*Id.*, at ¶ 14.) Days later, Corizon served each of them with a deposition notice and a subpoena for records. (*Id.*, at ¶ 15.) On February 19, 2021, approximately two days after Defendant and Landers were served, they obtained new cell phones to communicate about the litigation. (*Id.*, at ¶ 16.) Landers also sought to delete their 2019 messages so that they could not be retrieved by law enforcement. (*Id.*) Similarly, Wells sought to "clean up" his own email account, and the two men discussed purging their WhatsApp messages. (*Id.*, at ¶¶ 39, 41.) Moreover, each agreed that he would not produce documents that would damage the other. (*Id.* at ¶ 40.)

About three weeks later, each man was deposed via video by Corizon's counsel. (*Id.*, at ¶¶ 17, 18.) Landers testified first. Among other things, he claimed that he "had no recollection" of sending Defendant documents related to the RFP while Landers was the CFO of TDOC. (*Id.*, at ¶ 17.) Landers also falsely testified that he had not had any discussions "at all" with Defendant regarding the lawsuit. (*Id.*, at ¶ 17.) As soon as the video deposition concluded, Landers immediately called Defendant to discuss the litigation. (*Id.*)

Minutes after that call, Defendant's video deposition began. (*Id.*, at ¶ 18.) Defendant lied under oath, claiming that it had "been a few weeks" since he had communicated in any way with

3

Landers. (*Id.*) He also falsely testified that he and Landers had not communicated about the RFP while it was ongoing. (*Id.*)

Shortly after the depositions, Centurion produced records to Corizon. These included emails from Landers to Defendant attaching the draft RFPs. *See* Memorandum in Support of Motion to Amend, *Corizon v. Wainwright*, 3:20-c-v892, D.E. #68, at 4-7 (M.D. Tenn.). Centurion did not produce—and, the Government understands, did not have—the WhatsApp communications between Landers and Defendant. The parties then settled the litigation on undisclosed terms. *See* Stipulation of Dismissal, *Corizon v. Wainwright*, 3:20-cv-892, D.E. #116 (M.D. Tenn.). The State also re-issued the RFP, and, after a new round of bidding, it again awarded the inmate behavioral health services contract to Centurion.

About two years after Defendant's deposition, the Federal Bureau of Investigation (FBI) interviewed him. Defendant initially stated that he did not have any prior knowledge of the RFP before it was released. (PSR, at ¶ 20.) Later in the interview, he acknowledged having received the emails which Centurion had produced but said that he did not pay attention to them. (*Id.*) He did not volunteer that he and Landers had also used WhatsApp to communicate about the RFP. (*Id.*, at ¶ 24.) Although Defendant admitted that he and Landers had coordinated regarding their depositions, he claimed that Landers never told him what to say. (*Id.*, at ¶ 25.)

Communications between the United States and Defendant's prior counsel then broke down and the Government continued its investigation. After Defendant obtained his current representation, the parties negotiated a pre-indictment information and plea agreements. *See United States v. Landers*, 3:24-cr-169 (M.D. Tenn.). Landers died shortly thereafter and, Defendant subsequently declined to enter the guilty plea to which he had agreed. The United

4

States then brought the instant indictment. Defendant subsequently pleaded guilty to Count Two pursuant to a written plea agreement.

## II. GUIDELINES CALCULATION

Even though the U.S. Sentencing Guidelines are advisory, *United States v. Booker* provides that sentencing courts "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005). Using the Guidelines Manual for 2024, the PSR calculates Defendant's Guidelines Offense Level as 10. (PSR, at ¶ 58.) With a Criminal History Category of I, the PSR calculates Defendant's Guidelines range as 6-12 months within Zone B of the Sentencing Table. (*Id.*, at ¶ 94.)

Section 5C1.1, note 10(A) indicates that a defendant who receives the zero-point offender adjustment and is within Zone A or B of the Sentencing Table, a sentence other than a sentence of imprisonment is "generally appropriate." This is not the "general" case, however. As described in the factual background above, and further developed below, Defendant engaged in other dismissed and uncharged conduct which warrants an upward departure pursuant to Section 5K2.21. A two-level upward departure to reflect this conduct, which is otherwise not captured by the Guidelines, would make Section 5C1.1, note 10(A) inapplicable.

## III. FACTORS UNDER 18 U.S.C. § 3553(A)

In addition to determining a defendant's advisory Guideline range, a court must assess other applicable sentencing factors. *See* 18 U.S.C. § 3553(a). Those factors include the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; and to

5

Case 3:24-cr-00216    Document 22    Filed 07/03/25    Page 5 of 10 PageID #: 82

protect the public from further crimes of the defendant; the need to avoid unwarranted sentencing disparities; and the need to provide restitution to the victims. *See* 18 U.S.C. § 3553(a).

### A. Nature and Circumstances of the Offense

Defendant and Landers tried to improperly advantage Defendant's company in the bidding process for a $120 million contract. As Centurion calibrated its bid on the RFP, Defendant rigged a six-figure job for Landers at the company. Although the government never established proof beyond a reasonable doubt that this was a *quid pro quo* arrangement—potentially due to the intentional destruction of WhatsApp communications and emails—Landers was quite right to fear that their conduct looked like some of the crimes charged in *McCabe*.

Given this fear, Landers and Defendant did not want anyone else to discover their arrangement. By destroying evidence and lying under oath, they sought to hide their unethical—and potentially illegal—conduct. At a minimum, their perjury and obstruction distorted the just resolution of a matter pending before this Court.

### B. History and Characteristics of the Defendant

Unlike many others who come before this Court for sentencing, Defendant appears to have had a stable childhood. (PSR, ¶¶ 67-68.) He attended multiple institutions of higher education and had a lengthy professional career, including positions as President of a correctional healthcare company, an Account Director for a pharmaceutical company and, of course, Vice President at Centurion. (*Id.*, at ¶¶ 81-85.) He did not have significant substance abuse or mental health issues. (*Id.*, at ¶¶ 77-78.) In other words, his history and characteristics are those of someone who should have known the gravity of his criminal conduct and who has no external causes to blame.

Defendant has accepted responsibility for his offense of conviction. That is reflected in his reduction under U.S.S.G. § 3E1.1. Similarly, he has no criminal history. This is reflected in both his Criminal History Category and his two-level reduction under U.S.S.G. § 4C1.1. Accordingly, Defendant's acceptance of responsibility and lack of criminal history are already properly accounted for by the Guidelines, as reflected by the multi-point reduction that he has received. They do not warrant any additional downward variance.

### C. The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law and Provide Just Punishment for the Offense

In light of the seriousness of the offense, a meaningful custodial sentence is appropriate. Our system of justice depends upon witnesses telling the truth when they have sworn to do so. And although dishonesty during trials is the paradigmatic example of perjury, truth-telling during civil depositions is arguably an even greater systemic issue: from 1997 to 2024, civil *trials* declined from 10,155 to 3,295, while civil *cases* increased from 272,027 to 290,896. (*See* Judicial Business of the United States Courts (available at https://www.uscourts.gov/data-news/reports/statistical-reports/judicial-business-united-states-courts) Thus, unlike trial testimony, deposition testimony shapes the outcome of far more civil cases through its impact on case strategy, settlement decisions, and summary judgment motions. A sentence which reflects the importance of truth-telling in the federal courts is necessary and just.

To the extent that Defendant lost a job or has suffered reputationally as a consequence of his underlying conduct or his conviction, those are impermissible considerations, because a sentence based on such factors does not reflect the seriousness of the offense. *See United States v. Musgrave*, 761 F.3d 602, 608–09 (6th Cir. 2014) (holding that district court's consideration of a defendant's four years of legal proceedings, legal fees, the likely loss of his CPA license, and "felony convictions that would follow him the rest of his life" were impermissible and

7

remanding for resentencing). "Were it otherwise, these sorts of consequences—particularly ones related to a defendant's humiliation before his community, neighbors, and friends—would tend to support shorter sentences in cases with defendants from privileged backgrounds, who might have more to lose along these lines." *United States v. Bistline*, 665 F.3d 758, 765–66 (6th Cir. 2012). Accordingly, promotion of respect for the law militates in favor of a meaningful custodial sentence.

### D. The Need to Afford Adequate Deterrence to Criminal Conduct and Protect the Public from Further Crimes of the Defendant

Although Defendant is unlikely to be in precisely the same position as he was during his deposition, there is a need for specific deterrence in this case. Defendant undermined the integrity of the bidding on a multimillion-dollar government contract. He then agreed to destroy documents to evade the requirements of a subpoena from this Court. After conspiring with Landers to do so, he repeatedly lied under oath during his deposition. After a less-than-fully-candid interview with the FBI, Defendant signed an agreement to plead guilty to an information, only to back out of it when the government's cooperator died.

In short, ethical obligations in the RFP procurement process did not deter Defendant from misconduct. Neither did his oath in a proceeding before this Court. Nor did a visit from the FBI or an agreement with the Department of Justice. Taken as a whole, Defendant's conduct over the last five years gives the Government serious doubt that he will fully internalize the importance of honesty and integrity without a custodial sentence.

General deterrence is also important in this case. As the Sixth Circuit has stated, "white-collar crimes 'are especially susceptible to general deterrence' and 'there is a general policy favoring incarceration for these crimes.'" *United States v. Musgrave*, 647 F. App'x 529, 533 (6th Cir. 2016) (quoting *Musgrave*, 761 F.3d at 609). "Because economic and fraud-based crimes are

more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *Musgrave*, 761 F.3d at 609 (cleaned up).

Defendant's conduct here—planned well in advance and coordinated with a confederate—is a classic example of a rational, cool, calculated crime that is a prime candidate for general deterrence. Furthermore, in contrast to trial testimony, depositions take place in law offices—or, in this case, over the internet—rather than courtrooms. Prospective witnesses may be tempted to deceive another party if they think no one is watching—or, that even if someone is watching, no one cares. Absent a custodial sentence in this case, that may be precisely the conclusion they draw.

### E. The Need to Avoid Unwarranted Sentencing Disparities

According to the Judicial Sentencing Information ("JSIN") system's records, in the last five fiscal years, there have been only five defendants whose primary guideline was Section 2T1.6, with a Final Offense Level of ten and a Criminal History Category of I and without a substantial assistance departure. The average sentence of incarceration imposed for these defendants was four months.

However, the Sentencing Commission's national statistics are "starting point[s]," rather than ending points, for courts' efforts to "to avoid unwarranted sentence disparities among defendants with similar criminal records who have been found guilty of similar conduct." *See United States v. Stock*, 685 F.3d 621, 630, n. 6 (6th Cir. 2012); *United States v. Brown*, 828 F. App'x 256, 260 (6th Cir. 2020). Indeed, the disparity between white-collar crime and other crimes is also appropriate for the Court to consider: "One of the central reasons for creating the sentencing guidelines was to ensure stiffer penalties for white-collar crimes and to eliminate

9

disparities between white-collar sentences and sentences for other crimes." *United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008).

Here, the Court should give comparatively little weight to the JSIN statistics, as the sample size is exceptionally small. Furthermore, as set forth above, the facts of this case take it well outside a mine-run, standalone perjury case. *Cf. United States v. Bridgewater*, 950 F.3d 928, 937 (7th Cir. 2020) (holding that a sentencing disparity created by a plea agreement that takes into consideration dismissed conduct is not unwarranted).

### F. The Need to Provide Restitution to Any Victims of the Offense

There is no restitution owed in this case and so this factor need not affect the sentence imposed by the Court.

### IV. CONCLUSION

For the reasons set forth above, and subject to Defendant's Rule 32(i)(4) statement at sentencing, if any, the United States anticipates requesting that the Court sentence Defendant to ten months' imprisonment and the special conditions recommended in the Presentence Report (PSR). The United States further requests that the Court order impose the mandatory $100 special assessment.

ROBERT E. McGUIRE
Acting United States Attorney for the
Middle District of Tennessee

*/s/ Taylor J. Phillips*
Taylor J. Phillips
Assistant United States Attorney
719 Church Street, Ste. 3300
Nashville, Tennessee 37203
615-736-5151